23 69
47 331

No. 2954.—THE STATE OF LOUISIANA *v.* HUGH O. AMES.

Article 911 of the Civil Code, which provides that, when the deceased has left neither lawful decendants nor lawful ascendants nor collateral relations, the law calls to his inheritance either the surviving husband or wife, or his or her natural children, or the State, does recognize the State as an heir, entitled to inherit, in the absence of all other heirs. Therefore the State, not being an heir under any circumstances, is not entitled to notice of the probating of a will, as provided in article 935 of the Code of Practice.

In considering the question of the authenticity of an olographic will, courts will not give effect to the novelty of the testator in the selection of the place of deposit of the paper containing his last will, nor to the whims and vagaries in the dispositions of the last will and testament. But, on the contrary, they will look to the evidence tending to establish its genuineness, and if the document produced is shown by the evidence to be the last will and testament of the deceased, it will be so held, notwithstanding the circumstances surrounding its discovery, and the dispositions thereof may reasonably excite suspicion of its being the veritable act of the testator.

APPEAL from the Second District Court, parish of Orleans. *Duvig-neaud,* J. *Simeon Belden,* Attorney General, and *J. W. Thomas,* for the State, appellee. *C. Roselius* and *Alf. Philips,* for defendant and appellant.

TALIAFERRO, J. This is a suit to annul a judgment confirming an act of last will and putting in possession the party named therein as universal legatee. The action is brought in the name of the State on the alleged ground that the will probated is a forgery, and that the succession, pretended to be bequeathed by it, belongs of right to the State, in default of there being any one legally entitled to succeed. The answer is a general denial.

There was judgment in the court below, annulling the order probating the will and ordering its execution as having been rendered contrary to law. The defendant has appealed.

The grounds taken in behalf of the State are: That the order granted for the registry and execution of the will was rendered *ex parte,* and without the notice required by article 935 of the Code of Practice; that it was rendered on insufficient evidence; that the document, presented for probate and purporting to be the olographic will of Joseph Field, is spurious and forged, never having been written or signed by him.

Joseph Field, the alleged testator had been for more than fifty years a resident of this country, and, during the greater part of that time, a

State v. Ames.

citizen of New Orleans, where he died, at an advanced age, on the twenty-second of October, 1862. He had acquired an estate appraised at his decease to over sixty thousand dollars, and he was free from debt. Many years ago he had a partner in business named Jesse Cowand, with whom he lived on terms of intimacy and friendship during the life of the latter. After the death of Cowand, Field, it seems, lived most of the time with Cowand's children, of whom there were several daughters married, and two or three sons. Field was never married, and had no known relatives of any description. He appears to have been attached to the children of his old friend and partner, and the evidence makes it pretty clear that he intended to leave his property among them at his death. This was the belief of the family generally, and the succession he left has proved an apple of discord among them, and given rise to dissentions and improper feelings, which, unhappily, are often engendered under similar circumstances.

At the time of Field's death, a most diligent search was made for the expected will, but without effect. An administrator was appointed, who had the estate under his charge about two years, when he died, and, during the pendency of proceedings to appoint a successor, an instrument of writing, the one which is the subject of this litigation, was found and presented for probate as the last will and testament of Joseph Field. The circumstances under which, after a lapse of more than two years, this instrument is said to have been found, are somewhat novel, and, it is contended on the part of the plaintiff, sufficient to stamp it as the offspring of fraud and collusion. It is shown to have been found attached by paste or mucilage to the under side of the tray or till of a common leather trunk which had been in the possession of the defendant, Ames, ever since the death of Joseph Field. The wife of Ames is, by this strangely discovered will, named the universal legatee of the testator. The act is dated thirteenth October, 1862, during the last illness of Field, who, as we have before seen, died on the twenty-second of that month. It is dated " No. 422 Dryades street," New Orleans.

Amanda M. Cowand, the wife of Ames, was one of the daughters of Jesse Cowand. Subsequently to the probate of the will she died, and by act of last will constituted her husband, the defendant, universal legatee of her estate.

Recurring, now, to the grounds set up on the part of the State for annulling the will, we take the first—that the order for the probate of the will was *ex parte*, and rendered without the notice required by article 935 of the Code of Practice. That article provides that, " the party praying for the opening and proof of the will shall cause to be summoned the number of witnesses possessing the qualities required

for such proof, and if the presumptive heirs of the deceased, or any of them reside in the place, he shall give them notice, in writing, that they may attend, if they think proper, at the opening and proof of the will." Within the meaning of this article, it is argued that the State may become the presumptive heir of a deceased person, and that it always is the presumptive heir, when more than one year elapses without some one, having a better right, presents himself to claim it. Reference is made to article 911 of the Civil Code, which provides that, " when the deceased has left neither lawful descendants nor lawful ascendants, nor collateral relatives, the law calls to his inheritance either the surviving husband or wife, or his or her natural children, or the State, in the manner and order hereafter directed." This article, it is contended, recognizes the State as an irregular heir, and that, more than one year having elapsed without any heir to the estate of Field having presented himself, the State had become the presumptive heir, and was entitled to notice of the application for probate of the will. This doctrine we are not able to assent to. In no proper sense, we apprehend, can the State be styled an heir, when, in the absence of heirs of every denomination by law capable of succeeding by inheritance, the property of the deceased owner becomes vested in the public, and is at the disposal of the government. On this point Demolombe says: "The fourth law of the Code of Justinian, *De bonis vacantibus* declared, *Bona vacantia mortuorum tunc ad fiscum jubemus transferri, si nullum ex qualibet sanguinis linea vel juris titulo legitimum relinquerit intestatus haeredem.*" Such, then, is the true cause of acquisition to the profit of the State; the State is not in reality an heir or a successor, in the technical sense of this word, for it acquires by the title of *escheat;* that is to say, precisely in virtue of a title which supposes, necessarily, that there are no heirs; which caused Bacquet to say that, when a man dies without heirs, the goods left by his death *non vocantur bona hereditarea sed vacantia nominantur.* In a word, the State exercises in this matter the eminent right of sovereignty, in virtue of which it appropriates all property without a master which is found within its territory." Vol. 14, pp. 259 and 260.

It is objected that the order establishing the will was rendered upon insufficient evidence. Three witnesses were sworn. They all testify that they recognized the will to be entirely written, dated and signed by Joseph Field, their knowledge being derived from having often seen him write and sign his name. Upon the trial of the case, these witnesses were re-examined, and from the result the counsel on the part of the plaintiff deduce their entire ignorance of the handwriting of the testator. We do not find that the re-examination of the witnesses warrants this deduction. Two of the witnesses, the defendant and Aken, upon strict interrogation, say unqualifiedly that they had

seen him write, and they specify the times and occasions on which they saw him write. Aken represents Field as a man having but few correspondents, and who never wrote except on business or to some of the Cowand family. Ames says substantially the same thing. "I think," said this witness, "he wrote but seldom. He had but few correspondents; I know of no one in the city he corresponded with. He had some correspondence with the secretary of the Southern Pacific Railroad Company; he was a large stockholder; I saw him write these letters; this was in 1858 and 1859. * * * I never saw him write letters to any other parties; I think his correspondence was very limited; he wrote three in my presence, which I read; the subject matter of these letters was dictated by me; I mailed the letters. He wrote two checks between 1858 and 1859." The other witness, Licbrook, seems to have been but little regarded by either party in this contest, and the record abounds with proofs of his tergiversations and recklessness. We see nothing in the testimony of the two witnesses, Ames and Aken, that shows they were ignorant of the handwriting of Field. The evidence, however, shows that they could not have seen him *often* write and sign his name, but it also shows that Field did not often write. In the matter of the succession of Daniel Clark it was held that "the rules for the opening and proof of testaments, commencing at article 1649 of the Code, do not pronounce the penalty of nullity for their non-observance, and they nowhere say that other cases may not arise in which the strict letter of these rules may not be inapplicable, and the judge may not receive, in extraordinary cases, other equally satisfactory proof that the requirements of the law have been fulfilled. If a will is valid, the irregular proof on which it may have been admitted to probate, will not be permitted to affect the rights of the parties under it." 11 An. 128.

The counsel for the State insist with much earnestness, that on the thirteenth day of October, 1862, the day on which Field was removed from the house of Mrs. Herrick, No. 422 Dryades street, being the day on which the will was dated, the testator was, from his great prostration by disease, physically unable to write and to place the will in the position in which it was said to be found. It seems that Field was removed about nine o'clock A. M.; that he was then greatly enfeebled from diarrhea, which the attending physicians seem to have thought. necessarily fatal to a person of his great age. The wife of one of the physicians, Mrs. Ball, states in her testimony, that upon a suggestion to that effect by her husband, she said to Mr. Field the day before he was removed: " You are very sick, and if you have anything to settle,. you had better do it." To which he replied: " I am aware of my condition. I have twice told you before, I have made my will and all my business is settled. This witness, it appears, visited the testator·

several times and assisted in nursing him. She states that he was perfectly prostrated from the time he was taken sick; that he was unable to rise from his bed, and that he was so nervous that he could not hold a glass to his mouth to take water or medicine. The morning he was removed, he could not walk or sit up by himself." In the main, this testimony is sustained by Mrs. Herrick, at whose house he was taken sick. These witnesses both say that Field was removed in a carriage or cab. But this testimony conflicts materially with that of several other witnesses. Ames says that "Field, during the war, was with Mrs. Herrick on Dryades street; he was alone in the house with her; for economy and security it was arranged that she should come and live with us; she removed the furniture first, leaving him there; she came to my house on Saturday; the next morning the negro girl, Caroline, came and said it was a shame that Julia (Mrs. Herrick) had left the old gentleman behind sick. My wife went round to see him. On Sunday evening, I visited him with Dr. Post. We ascended the stairs; the door was locked; we knocked; Mr. Field opened it." In regard to the removal of Mr. Field the next day, the witness says: "He (Dr. Post) went to the house with me to bring Mr. Field round to my house; Mr. Field was between me and Dr. Post, and walked to my house, a distance of seven squares and a half." Caroline Stevens, a witness, says: "I staid with him all the time during his last illness. * * * He was not confined to bed entirely. * * * He war lying down all day Sunday, except when he got up to go out and come back. * * * When Mrs. Herrick went away, he walked up and down stairs by himself. Mr. Field was never so sick in Mrs. Herrick's house that it was necessary to lift him out of bed. I am certain Mr. Field was walked from Mrs. Herrick's house to Mr. Ames'; I am certain of this." In regard to the manner of the removal of Field, the statement of Ames and Caroline Stevens is corroborated by the testimony of Mrs. Leech and Windsor Campbell. Indeed, Mrs. Herrick, in a subsequent part of her testimony, admitted that she knew nothing of the manner in which he was removed; that she knew it only from hearsay. The evidence does not incline us to believe that there was, on the day the will purports to be dated, such a prostration of the bodily powers of Mr. Field as to have rendered it physically impossible for him to write the will or to deposit it where it was found.

In relation to the genuineness of the will, the judgment of experts, persons who were acquainted with the testator, was taken on the trial of the case, in the court below, by a comparison of the signature to the will with genuine signatures of Mr. Field on bank checks introduced in evidence. One of these, a president of a bank, spoke doubtingly on the subject. He "would not have paid checks having the same signature to them as that to the will and envelop. The signature

10

to the will and the envelop seem to be written by a sick person. I knew Mr. Field to be an old man, and it is possible that, in sickness, his handwriting and signature might have varied much." The treasurer of the Savings Institution found that "some of the checks, numbers one, two and three, compared very well, except in the trembling in the will. The signatures to the checks five and thirteen do not compare well with that to the will, nor do they compare to the check number fourteen. I know the check number fourteen to be Mr. Field's handwriting, for I paid it myself. The body of the check was written by me. If at the time when the signature to the will was written, Mr. Field had been sick, I should say it was signed by the same person who signed check number fourteen." A book-keeper and clerk in one of the banks of New Orleans said: "I was acquainted personally but not intimately with the late Joseph Field; I had occasion every six months to give him a check for his dividend; I was at the time familiar with the signature of Mr. Field; I recognize the signature on the will, marked A, now presented to me, to be his, as far as my judgment goes." The statements of these three witnesses, taken together, we think, are rather in favor of the genuineness of the will than against it. These men, we may suppose, have no interest or feeling in the matter. The testimony of the defendant and that of Jesse Cowand and A. K. Aken are in support of the genuineness of the instrument. Liebrook's testimony is equivocal, and entitled to little weight. These are all the witnesses that testified as to the handwrite and signature of the testator.

It is in evidence that the trunk in which the will was found was strictly examined at the decease of the testator, with the view of finding a will, and that it passed into the possession of the defendant and has ever since been kept in his house. In it were found, at the time of the inventory, most of the valuable papers of the decedent. It must be admitted that the history of this will is not free from some degree of romance, and the facts and circumstances connected with it are calculated, not unreasonably, to excite suspicion of its being the veritable act of last will of Joseph Field. But we should bear in mind that examples are not wanting of whims and vagaries displayed by testators, as well in regard to the places chosen to deposit their wills, as to their contents. There is an air of improbability in the account given of so scrupulous a search being made for the much desired act, and that, in the identical trunk that contained it, without success; that it escaped the sight of all so intensely occupied in pursuit of it, and that an accident alone led to its discovery more than two years afterwards. Yet it is clear that such an occurrence is not impossible. The important point in such a case is, to determine, if possible, whether the instrument be genuine or spurious. To this end

State v. Amos.

we have examined the evidence with much care. We have had, pre-sented for our inspection, the act itself with letters acknowledged to have been written by Joseph Field, and also the checks proved to have been signed by him. We have compared the handwriting and the signatures, and, after full consideration of the whole, we do not feel justified in pronouncing the act a forgery. We think its validity established, and that it should be maintained.

It is therefore ordered, adjudged and decreed that the judgment of the district court be annulled, avoided and reversed; that the defend-ant be quieted in his ownership and possession of the property acquired by him, as the universal legatee of his late wife, Amanda M. Cowand, and which was denied to her, as the universal legatee of Joseph Field, deceased.